# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ERNESTO RIVERA,

      Plaintiff,

  v.                                                                                               Case No. 14-C-6

KETTLE MORAINE CORRECTIONAL
INSTITUTION, et al.,

      Defendants.

## ORDER ON MOTION FOR COUNSEL

      Plaintiff Ernesto Rivera filed this civil rights action under 42 U.S.C. § 1983 alleging that six nurses at Kettle Moraine Correctional Institution (KMCI) violated the Eighth Amendment prohibition of cruel and unusual punishment by their deliberate indifference to his serious medical needs. More specifically, Rivera alleges that the nurses failed to properly respond to his complaints of severe abdominal pain, which began on the evening of June 17, 2013, and delayed having him seen by a physician and/or transferred to a hospital until the afternoon of June 20, 2013. Upon his arrival at the hospital, it was determined that his appendix had ruptured and surgery was performed.

      The court entered a screening order allowing Rivera's case to proceed but denied his motion for appointment of counsel on February 4, 2014. A renewed request for appointment of counsel was initially denied on March 5, 2014. During a telephone conference on March 24, 2014, however, the court stated it would take Rivera's request for counsel under further advisement. Having given Rivera's request further consideration, I now conclude that it should be granted.

This case, like many prisoner cases involving claims of deliberate indifference to serious medical needs, is not a simple case. For embedded in Rivera's allegations that the defendant nurses violated his constitutional rights is the claim that their failure to properly respond to his presenting symptoms constitutes medical malpractice and more. Simple medical malpractice, of course, does not constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). But where, as here, the defendants actually responded to his medical complaints, the prisoner's claim that they were deliberately indifferent is, in effect, a claim that the defendants ignored obvious indications that a more aggressive response was indicated.

Here, for example, Rivera alleges that he experienced an extreme amount of pain in his stomach at around 8:30 p.m. on June 17, 2013. Rivera alleges he told Sgt. Jozwiak at about 10:p.m. after the nightly count. Sgt. Jozwiak called the Health Services Unit (HSU) and was told there were no nurses or doctors there and he would have to wait until the next day. Rivera alleges that he went to HSU on June 18, 2013, and told the nurse he had an extreme amount of pain in his stomach. The nurse told him it was flu or gas and told him she would get him some antacid. Rivera alleges that he argued that it was not flu or gas, but the nurse sent him back to the unit. He alleges that he later returned to HSU the same day and saw another nurse. She also told him it was flu or gas and that it would go away. Rivera alleges that he told the nurses it was an appendicitis but they insisted it was flu and gas and would go away if he drank some water and walked around. Rivera asked to see

This case, like many prisoner cases involving claims of deliberate indifference to serious medical needs, is not a simple case. For embedded in Rivera's allegations that the defendant nurses violated his constitutional rights is the claim that their failure to properly respond to his presenting symptoms constitutes medical malpractice and more. Simple medical malpractice, of course, does not constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). But where, as here, the defendants actually responded to his medical complaints, the prisoner's claim that they were deliberately indifferent is, in effect, a claim that the defendants ignored obvious indications that a more aggressive response was indicated.

Here, for example, Rivera alleges that he experienced an extreme amount of pain in his stomach at around 8:30 p.m. on June 17, 2013. Rivera alleges he told Sgt. Jozwiak at about 10:p.m. after the nightly count. Sgt. Jozwiak called the Health Services Unit (HSU) and was told there were no nurses or doctors there and he would have to wait until the next day. Rivera alleges that he went to HSU on June 18, 2013, and told the nurse he had an extreme amount of pain in his stomach. The nurse told him it was flu or gas and told him she would get him some antacid. Rivera alleges that he argued that it was not flu or gas, but the nurse sent him back to the unit. He alleges that he later returned to HSU the same day and saw another nurse. She also told him it was flu or gas and that it would go away. Rivera alleges that he told the nurses it was an appendicitis but they insisted it was flu and gas and would go away if he drank some water and walked around. Rivera asked to see

a doctor and the nurses told him the doctor would be there on June 20 and he was on the list to see him then. Rivera made further complaints of severe abdominal pain on June 19, but his requests to be taken to a doctor were refused. At about 2:00 p.m, he passed out in his cell and was finally taken to the emergency room of a nearby hospital where he was diagnosed with a fever and a ruptured appendix.

Was the response of the nurses a normal response to Rivera's complaints or was it deliberate indifference to his serious medical need? To answer that question requires an expertise beyond that of Rivera, counsel or the court. It requires someone who by education, training or experience has knowledge of medicine and nursing. *See Garner v. Sumnicht*, No. 13-3107, 2014 WL 278493, *1 (7th Cir. Jan. 27, 2014) (unpublished) ("Normally we would expect the plaintiff in a serious case about medical treatment to offer expert testimony."). Thus, it may not be sufficient to recruit counsel for Rivera in order for him to prevail. He may also need an expert witness and maybe more than one. In fact, absent expert testimony, a lawyer may be unable to provide much assistance.

*Garner* suggests that in cases like this, the district court must recruit counsel: "Under these circumstances, the district court should have attempted to recruit a lawyer for Garner, who appears to be unable to present a case dependent on medical evidence—yet has enough of a substantive claim that the court cannot dismiss it as obviously deficient." *Id.* at * 2. Here, as in *Garner*, the case is not so obviously deficient that it can be dismissed and it is also dependent on medical evidence that Rivera is unable to present without counsel. But *Garner* is unpublished and thus is not precedential. Fed. R. App. P. 32.1(b).

Recognizing the complexity of his claim and in an effort to assist the court in determining whether the case was one in which counsel should be recruited, the court requested a law firm that

is known in the area as one that specializes in personal injury litigation, including medical malpractice, to evaluate Rivera's case. More specifically, the court asked the attorney to perform the same kind of initial evaluation it would perform on a claim by a non-prisoner to determine whether it was the kind of case in which the members of his firm would be willing to invest the time and resources that would be required to handle the case, realizing that actual attorneys fees and costs would be recoverable in the event the plaintiff prevailed. (ECF No. 23.) The court provided copies of the pleadings and medical records filed by Rivera to assist in the evaluation and invited counsel to speak with Rivera if he thought it would prove helpful.

The law firm responded to the court's request in a letter dated April 29, 2014. Based on its assessment of both liability and potential damages, the firm concluded that the case did not warrant the kind of investment that would be required to handle the case. On the question of liability, the firm provided the following analysis of the medical issues:

> Appendicitis can be difficult to diagnose in its earlier stages. Initially, symptoms can be somewhat vague and include generalized aching abdominal pain across the entire abdomen. This pain will then progress to become more right sided abdominal pain. Symptoms can also include nausea, vomiting, diarrhea, and lack of appetite. In addition, patients will develop a fever. The challenge in diagnosis is that these symptoms can also be attributed to a gastrointestinal infection and, as a result, appendicitis is often misdiagnosed. In our opinion, it would be very difficult to prove medical negligence for the delay in the diagnosis of appendicitis. Although Mr. Rivera was having significant abdominal pain, that was not relieved with antacids, and saw the RN several times over 2-3 days, he was afebrile and his pain was initially generalized. Once he stated he was having right sided abdominal pain, he was transferred to the hospital.

(ECF No. 33 at 2.) In addition to the difficulty of proving liability, the firm also concluded that the potential damages in the case would not be sufficient to justify the cost that would be required to fully prosecute the claim. This was because surgery would have been required in any event and it

appeared there were no long term effects of the condition that would require ongoing medical care or limit his activities. Rivera also had no unpaid wage loss or medical expenses to recover.

In response to a further inquiry from the court, the law firm explained that its assessment of the medical issues was based on a thorough review of the records by its medical malpractice team which consists of attorneys who practice in the field and paralegals with nursing degrees. (ECF No. 36.) Because the issues were within the purview and experience of the team, an outside medical consultant's review was not considered necessary. The firm also explained that the medical malpractice cases require high caliber expert testimony. The firm estimated that the experts needed in a case of this kind would be an expert registered nurse (RN) to testify regarding the standard of care for an RN in a prison setting, a general surgeon to explain the ruptured appendix and surgery for a ruptured appendix, and possibly an infectious disease medical expert or general practitioner to explain the infection from a ruptured appendix and hospital treatment thereof. These types of experts charge between $300 and $500 per hour, the firm explained and out-of-pocket costs could easily exceed $100,000 through trial. The firm would also expect to invest hundreds of hours of attorney and paralegal time in the case as well. Finally, the firm noted that medical malpractice cases seldom settle before trial and it is therefore likely that it would incur these costs and fees in handling the case.

This evaluation by a firm experienced in such cases raises substantial questions about the wisdom of the court recruiting counsel. Based on the evaluation, it would appear unlikely that Rivera would be able to convince an attorney to take his case if he was not serving a prison sentence. Proving even that the nurses were negligent in such a case would be difficult and expensive, let alone that they were deliberately indifferent. And the possible recovery would be

limited. Surgery would have been required in any event, and its cost, as well as the cost of all medical care, was paid by the State in any event. Because Rivera incurred no medical costs and suffered no wage loss, his damages are limited to compensation for whatever additional pain and suffering Rivera endured because of the delay in diagnosis. Does the fact that Rivera is a prisoner serving a sentence for a crime afford him a greater right to attorney representation than a non-prisoner who was turned away from a hospital under similar circumstances? Moreover, if despite concerns over the merits and substance of the case, the court recruits pro bono counsel for Rivera, it will significantly increase the cost of resolving this lawsuit to the defendants, all of whom are indemnified by the State and defended at State expense. At the very least, the court has increased the leverage the plaintiff has for settlement purposes. The presence of counsel and potentially expert witnesses on the other side significantly increases the costs of defense. Can the court take such actions that benefit one party consistent with its obligation to remain neutral and impartial? If the likelihood of success is not great and the potential recovery, even if Rivera prevails, is insufficient to justify the investment of time and resources required, is the court furthering the cause of justice by recruiting a law firm to represent Rivera?

These are all important questions, but as I read the law in this circuit, none of them bear on the issue before the court. In this circuit, the legal standard for deciding motions to recruit counsel under § 1915(e)(1) motions requires the district court to consider only the difficulty of the case and the pro se plaintiff's competence to litigate it himself. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007) (*en banc*). Noticeably absent from the list of factors *Pruitt* instructs the court to consider are the merits and substance of the pro se plaintiff's claim. In this respect, the law in this circuit appears significantly more favorable to indigent litigants than the law in other circuits, which

generally allow a more searching evaluation of the merits before counsel is appointed. *See, e.g., Cookish v. Cunningham*, 787 F.2d 1, 2-3 (1st Cir. 1986) ("That the plaintiff has alleged sufficient facts to state a claim in the complaint does not in and of itself require the appointment of counsel."); *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986) (holding that in deciding whether to request an attorney to represent an indigent plaintiff they "should first determine whether the indigent's position was likely to be of substance"); *Montgomery v. Pinchak*, 294 F.3d 492, 501 (3d Cir. 2002) (holding that plaintiff's claim must have "arguable merit," meaning that plaintiff's allegations "clearly state a non-frivolous, prima facie case of deliberate indifference to a serious medical need and that the already established evidence indicates more than an 'extremely slim' chance of success on the merits"); *Mars v. Hanberry*, 752 F.2d 254, 256 (6th Cir. 1985) ("Appointment of counsel pursuant to 28 U.S.C. § 1915(d) is not appropriate when a pro se litigant's claims are frivolous, or when the chances of success are extremely slim."); *Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986) ("A finding of exceptional circumstances requires an evaluation of both 'the likelihood of success on the merits [and] the ability of the petitioner to articulate his claims pro se in light of the complexity of the legal issues involved.'"); *Toevs v. Reid*, 685 F.3d 903, 916 (10th Cir. 2012) ("The factors to be considered include the merits of a prisoner's claims, the nature and complexity of the factual and legal issues, and the prisoner's ability to investigate the facts and present his claims.").

The Second Circuit's consideration of the issue appears to have been the most extensive. In *Hodge*, relying on this circuit's pre-*Pruitt* decision in *Maclin v. Freake*, 650 F.2d 885 (7th Cir. 1981), the court advised district judges that in deciding whether to request an attorney to represent an indigent plaintiff they "should first determine whether the indigent's position was likely to be

of substance." *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986). Only if the claim meets this threshold requirement should the court go on to consider such secondary factors as "the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination." *Id*. at 61-62. Moreover, in making this threshold determination of whether the indigent's claim is of substance, the Second Circuit has emphasized that it is not enough that the complaint has survived the court's initial screening under 28 U.S.C. § 1915A, a motion to dismiss or even summary judgment:

> "Even where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." [*Maclin*,] 650 F.2d at 887 (citing *Miller* [*v. Pleasure*, 296 F.2d 283, 284 (2d Cir.1961)]. As indicated above, this is already part of the law in this circuit, and it is a requirement that must be taken seriously. If mere bald assertions by an indigent, which technically put a fact in issue and suffice to avert summary judgment, required appointment of an attorney under § 1915(d), the demand for such representation could be overwhelming.

*Hodge*, 802 F.2d at 60.

Perceiving that its instructions in *Hodge* had been misinterpreted by many district courts that were automatically requesting volunteer counsel without regard to the likely substantiality of the claim simply to avoid creating an issue for appellate review, the Second Circuit returned to the issue three years later in *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170 (2d Cir. 1989). In *Cooper*, the court expanded its explanation of the importance of assessing the substantiality of the claim before considering a request for *pro bono* counsel. The court first noted that volunteer attorney time is a precious commodity that should not be wasted: "Because this resource is available in only limited

quantity, every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause." *Id.* at 172.

The court also addressed the argument that it is unfair and a denial of equal access to refuse the indigent counsel for claims that the rich could hire counsel to pursue:

> The homily as to accessibility of the courts to rich and poor alike also has weaknesses. It is simply not true that the suits of individuals are generally financed by their personal means. Litigation long ago became so expensive that it exceeds the means of all but a tiny fraction of the population. As a general proposition, the availability of counsel for claims by individuals is determined less by the wealth of the claimant than by the merits of the claim. The vast majority of litigation on behalf of personal claimants is financed initially by lawyers who accept the representation for a contingent fee in the expectation of being rewarded by a share of the winnings. In addition to the contingency arrangement, there are statutes, including 42 U.S.C. § 1988, which guarantee pay to a prevailing lawyer at the expense of the adversary. Under these statutes, if the claim will prevail, the lawyer will be well paid without expense to the client, even though the lawsuit may involve only matters of principle without monetary award. Thus, in society at large, it is not so much the comparative wealth of potential claimants that determines whether they can succeed in obtaining the services of counsel, but the likely merits of their claim. If the claim has likely merit, a lawyer can take it with considerable confidence in being reasonably paid—sometimes very well paid.

*Id.* at 173. Thus, the court concluded "The poverty of the claimant may often be irrelevant to his ability to secure counsel. If the claim is promising and relates to an injury that can be expected to produce substantial damages, a contingency lawyer will often be motivated to take it regardless whether the claimant is indigent or has property." *Id.* These observations led the court to conclude that requiring the indigent seeking a free lawyer to first pass the test of likely merit did not amount to discrimination against the poor. Instead, the court concluded the rule favors evenhanded standards: "A claim that could not command a lawyer's acceptance if possessed by an employed middle-class property owner should not command a pro bono lawyer." *Id.*

On the other hand, the court also acknowledged that an indigent plaintiff's inability to obtain counsel could be due to factors other than the absence of merit or substance to his claim. "If the indigent plaintiff is a prison inmate or a homeless vagrant, he may have no effective means of bringing his claim to the attention of the lawyer marketplace to have its merits appraised." *Id.* at 174. Given such difficulty, the court suggested that "a useful endeavor of courts (perhaps assisted by bar associations)" would be to screen and "create mechanisms to insure that such claims of prisoners and other indigents be brought meaningfully to the attention of that segment of the bar which is economically motivated to assume representation in anticipation of winning contingent, or court-awarded, fees." *Id.* The court concluded in *Cooper*:

> Courts do not perform a useful service if they appoint a volunteer lawyer to a case which a private lawyer would not take if it were brought to his or her attention. Nor do courts perform a socially justified function when they request the services of a volunteer lawyer for a meritless case that no lawyer would take were the plaintiff not indigent. Courts would, however, significantly advance the justified claims of the poor if they established mechanisms to insure that the claims of indigent, disadvantaged litigants will be reviewed by lawyers whose business is to pursue claims of similar nature. Such a brokerage service would be likely to find counsel for many with meritorious claims.

*Id.*

That is essentially what this court did here. It brought Rivera's case to the attention of a law firm whose business it is to pursue similar claims. Only after receiving the firm's evaluation and upon further research of the law did the court realize that the merits and substance of the claim are not among the factors to be considered by the district court in deciding whether to recruit counsel in this circuit.

Even before *Pruitt*, *Maclin*'s multi-factor test, beginning with the merits of the claim, had been discarded by the Seventh Circuit. In *Farmer v. Haas*, the court eliminated consideration of

the merits which, the court explained, was the same as whether it was "colorable," since "if the plaintiff doesn't even have a colorable claim, the case should be dismissed out of hand. There is no need to worry about counsel." 990 F.2d 319, 322 (7th Cir. 1993); *see also Greeno v. Daley*, 414 F.3d 645, 658 (7th Cir. 2005) (noting that "[i]n *Farmer v. Haas* we discarded Maclin's multifactor test in favor of the following more straightforward inquiry: "given the difficulty of the case, did the plaintiff appear to be competent to try it himself and, if not, would the presence of counsel have made a difference in the outcome?"). The Seventh Circuit has also rejected the market approach seemingly favored by the Second Circuit in *Cooper* and by Judge Posner at least in earlier days. *See Merritt v. Faulkner*, 697 F.2d 761, 768-69 (7th Cir. 1983) (Cudahy, J., concurring); *but see McKeever v. Israel*, 689 F.2d 1315, 1323-25 (7th Cir. 1982) (Posner, J., dissenting). Thus, the fact that a firm that specializes in personal injury cases has concluded that Rivera's claim is not of sufficient merit or substance to invest its time and resources is not a factor the court can consider. Instead, the question before the court is "whether the difficulty of the case – factually and legally – exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Pruitt*, 503 F.3d at 655.

For the reasons already given, this case is complex simply by virtue of the fact that it involves medical evidence. *Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010) (noting that "cases involving complex medical evidence are typically more difficult for pro se defendants"); *Pruitt*, 503 F.3d at 655-56 (same); *Greeno*, 414 F.3d at 658 (noting that inmate's case is "legally more complicated than a typical failure-to-treat claim because it requires an assessment of the adequacy of the treatment that [inmate] did receive, a question that will likely require expert testimony"). Such claims also involve the state of mind of the defendant or defendants, an additional issue that

the court has found complex "one of the more challenging aspects of section 1983 litigation." *Santiago*, 599 F.3d at 762. Indeed, based on the court's recent decision in *Henderson v. Ghosh*, it is difficult to envision a prisoner case involving a claim of deliberate indifference to serious medical needs based on a failure to diagnose and/or treat that would not be complex, assuming it survives screening and/or a motion to dismiss. No. 13-2035, ___ F.3d ___ 2014 WL 2757473 (7th Cir. June 18, 2014).

In *Henderson*, the plaintiff claimed deliberate indifference based on the failure of the prison medical staff to diagnose and treat his kidney disease until it had reached Stage 5 requiring that he undergo dialysis several times a week for the rest of his life. The court noted that the case involved complex medical terms and concepts, as well as proof of the defendants' state of mind, as do nearly all cases involving allegations of failure to diagnose and treat serious medical conditions. The court also noted that to prevail, the plaintiff would have to prove that the defendants' treatment of his condition was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on accepted professional judgment," thus requiring expert medical evidence. *Id.* at \*6 (internal quotations and ellipsis omitted). The same is true here.

On the issue of the plaintiff's capacity to present his case without counsel, the court noted in *Henderson* that the plaintiff had a fifth grade education and, according to records from his state criminal case, a below average IQ of 64. Other prisoners, so called jailhouse lawyers, had prepared his filings. It was based on the relatively high quality of the plaintiff's filings that the district court had concluded that Henderson was competent to proceed without recruited counsel, which the Court of Appeals concluded was error. Given his own limitations, "exacerbated by his incarceration,

- 12 -

which further restricted his ability to investigate the facts," the Court of Appeals concluded that "Henderson was severely limited in his capacity to litigate his own case." *Id.* at * 5.

In his motions seeking appointment of counsel for his case, Rivera said nothing of his own capacity instead emphasizing the complexity of the case and his inability to find counsel who would take the case without payment of fees. (ECF No. 4, 13.) In response to the court's inquiry's at a telephone status conference, however, Rivera explained that he was born in Puerto Rico and had come to this country in 2000 or 2001, which from the year of birth stated in the medical record, would put him at age 26 or 27. (March 24, 2014 Hearing (not transcribed), ECF No. 16-1.) Spanish was his first language, and he attended school up to the sixth grade. Rivera also said he was currently learning to read and write, though he also claimed he wrote his own complaint and other filings. (March 24 Hearing.) Finally, I note that Rivera is incarcerated and thus, like Henderson, his limitations are exacerbated and his ability to investigate facts and obtain expert testimony further restricted. It follows that Rivera lacks the capacity to coherently present his case to the judge or jury himself.

I conclude from the above analysis that under the law of this circuit it would be considered an abuse of discretion for the court to deny Rivera's request that the court recruit counsel for him. In so ruling, I share the concern stated by Judge Posner in *Merritt* that such an analysis "implies that a prisoner is entitled to appointment of counsel in any personal-injury case where a medical issue is raised." 697 F.2d at 771 (Posner, J., dissenting). Given an aging and medically needy prison population, the consequences of such a rule would likely be significant both to the State and the private bar. The State, already charged with the cost of safely and securely housing, feeding, clothing and providing medical care to its prison population, will have to devote more resources to

defending actions by prisoners with serious health problems who are dissatisfied with the care they receive. And the bar is at risk of being inundated with requests from federal judges that they take on cases that lack either the merit or the value that would warrant the investment of their time and money that would lead an attorney to take the case absent the judge's request. Even with the generous pro bono volunteer attorney time currently being offered under the district plan, there are already difficulties in recruiting counsel for prisoner cases.

These considerations aside, the fact remains that Rivera has a case, and the fact that his case does not meet the criteria for acceptance of a law firm that specializes in personal injury cases does not mean that the nurses conduct did not violate his constitutional rights or that he cannot prevail. The effective hourly rate such a firm may regularly earn as a contingency fee may well dwarf what it could recover as an hourly fee in a civil rights case. Nor is such a firm's assessment of the costs it would incur in bringing such an action determinative. Based on Rivera's account, he complained of severe abdominal pain for almost three days, and despite his insistence that it was not gas or the flu, the nursing staff did nothing but give him antacid and tell him to drink water and walk. Convinced it was his appendix, Rivera repeatedly asked to see a doctor. Unlike a person outside a prison, Rivera was not free to go the emergency room himself but was dependent upon the nursing staff to recognize the severity of his condition and the need for immediate attention. Instead, he was told he would have to wait until the doctor was scheduled to come to the institution. According to Rivera, even the guards seemed to recognize the severity of his condition. A less costly strategy may prove more appropriate, and other facts helpful to the plaintiff may surface. *See, e.g., Sherrod v. Lingle*, 223 F.3d 605 (7th Cir. 2000).

Whether Rivera's rights were violated will ultimately depend upon the determination of the facts and he lacks the capacity to investigate and present the case on his own. Accordingly, his motion for recruitment of counsel is granted. In granting the motion, however, it is not the intention of the court to impose upon counsel willing to accept the case the obligation to retain expert witnesses on Rivera's behalf. It is counsel's time and assistance the court is requesting on behalf of Rivera, not out-of-pocket expenses for experts. Of course, if counsel chooses to retain experts based on his or her own evaluation of the merits, counsel is free to do so. But it shall not be deemed a breach of any professional obligation of counsel owed to Rivera should he or she decline to do so. Deposition and related expenses are payable from the district's pro bono fund pursuant to and subject to the conditions of the plan. The district's pro se law clerk is directed to advise the court of the attorney or firm willing to accept the appointment.

**SO ORDERED** at Green Bay, Wisconsin this ___24th___ day of June, 2014.

                                                              s/ William C. Griesbach
                                                              William C. Griesbach, Chief Judge
                                                              United States District Court